# Exhibit A

# PREPAYMENT AGREEMENT

**THIS PREPAYMENT AGREEMENT** (this "**Agreement**") is made as of the Effective Date set forth below between PRODUCE PAY INC., a Delaware corporation ("**Company**"), and the Producer identified below (the "**Producer**").

The Company has developed and made available an online software Platform for the purchase and sale of Produce as described in the Terms and Conditions (defined below). To fund the Producer's preseason needs with respect to, among other things, planting, growing and harvesting Produce, the Company shall purchase the Prepaid Asset Pool (as defined below) on the terms set forth herein.

The parties hereby agree as follows:

1. **Terms and Conditions**. The General Terms and Conditions attached hereto as Exhibit A ("Terms and Conditions") are incorporated herein by reference. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Terms and Conditions.

2. **Transaction Terms**. The following are the transaction terms ("**Transaction Terms**") as used in the Terms and Conditions.

| | |
|---|---|
| *Producer Name* | CVR QUALITY AVO S DE RL |
| *Producer Address*<br>*Distributor City, State, Zip, Country* | Carretera Uruapan-San Juan Nuevo<br>#5001 Col. Jucutacato C.P.60230<br>Phone: 452-525-6962<br>Attn: Carlos Viveros Rosalès<br>Email: direccion@cvrquality.com |
| *Effective Date* | February 15, 2019 |
| *Estimated number of cases* | 361,600 |
| *Aggregate Estimated Gross Sale Proceeds* | US $11,385,336 |
| *Prepayment Sales Commission Rate* | 1.61% |
| *Prepayment Sales Commission (determined by multiplying Estimated Gross Sale Proceeds by Prepayment Sales Commission Rate)* | US$ 183,304 |
| *Prepayment Recovery Deduction Rate* | 23% |
| *Repayment Deadline* | 08/20/19 |
| *Application Fee (deducted from First Advance) to cover site visit costs and other due diligence expenses* | US$11,500 |
| *Prepaid Asset Pool Purchase Price* | $1,000,000 |

*Advances*

| *Prepaid Asset Pool Number* | *Advance* | *Advance Amount* | *Date of Advance* | *Anticipated Repayment Date* | *Daily Adjustment Factor* |
|---|---|---|---|---|---|
| **PP**_____ | First Advance | US$650,000 | 02/15/2019 | 06/18/19 | US$890 |
| | Second Advance | US$350,000 | 03/19/2019 | 08/20/19 | US$480 |

*Performane Milestones*

| *Milestone Deadline* | *Performance Milestone* |
|---|---|
| 03/12/19 | $500,000 of Estimated Gross Sales Proceeds for Produce shipped from 02/19/19 to 03/12/19 |
| 03/29/19 | $800,000 of Estimated Gross Sales Proceeds for Produce shipped from 02/19/19 to 03/29/19 |

| | |
|---|---|
| 04/30/19 | $1,800,000 of Estimated Gross Sales Proceeds for Produce shipped from 02/19/19 to 04/30/19 |
| 05/31/19 | $2,500,000 of Estimated Gross Sales Proceeds for Produce shipped from 02/19/19 to 05/31/19 |
| 06/28/19 | $3,300,000 of Estimated Gross Sales Proceeds for Produce shipped from 02/19/19 to 06/28/19 |
| 07/30/19 | $3,700,000 of Estimated Gross Sales Proceeds for Produce shipped from 02/19/19 to 07/30/19 |

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**PRODUCE PAY INC.**

By: ______________________

Name: Ben Dusastre

Title: CFO

CVR QUALITY AVO, S. DE R.L.

(Print Producer Name)

By: ______________________

Name: Carlos Viveros Rosales

Title: Propietario

**Exhibit A**

**Produce Pay Inc.**
**General Terms and Conditions**

These Terms and Conditions ("Terms and Conditions") are incorporated by reference into the Produce Pay Inc. Prepayment Agreement to which they are attached. All Section and Article references in these Terms and Conditions shall be references to provisions in these Terms and Conditions unless explicitly stated otherwise. Capitalized terms used in these Terms and Conditions without definition shall have the meanings given to them in the Prepayment Agreement to which they are attached. All references to "this Agreement" shall mean the Prepayment Agreement to which these Terms and Conditions are attached, together with these Terms and Conditions incorporated therein.

## ARTICLE 1

## THE PLATFORM

Company has developed and made available an online software platform to provide alternative financing for produce growers that operates in the following manner (which manner of operation may be changed by Company from time to time in its sole discretion):

(a) Upon harvest of Produce included in the Prepaid Asset Pool, the Producer shall log into the Platform to notify the Company of the harvest and shipment of the Distributed Asset Pool. The Producer may only ship Produce included in the Prepaid Asset Pool to a distributor that is an approved and registered Distributor on the Platform under which the Distributor can accept or reject a Distributed Asset Pool.

(b) The Producer must provide the Company via the Platform documentation that is up to Company's standards, that has received an inspection report and that has appropriate insurance and deductible to sufficiently cover all of Company's Prepaid Asset Pool Purchase Price, and other amounts owed hereunder.

(c) Upon shipment of a Distributed Asset Pool by the Producer to the Distributor, and for as long as documentation, including but not limited to bill of lading, export documents and shipping documents is up to Company's pre-determined standard, the Distributor shall notify Company and the Producer of its acceptance or rejection of shipment of such Distributed Asset Pool as satisfactory for sale as a consignment item by the Distributor to retailers or wholesalers under the terms of the Distribution Agreement. All rejected Produce shall be removed from the Platform.

(d) By the terms of this Agreement and the Producer's use of the Platform, the Distributor and the Producer agree that the Distributor shall remit all Net Sale Proceeds to Company and that the Company is entitled to the Company Proceeds.

(e) Upon payment of retailer or wholesaler to the Distributor for the Distributed Asset Pool, the Distributor shall send electronic notice via the Platform to Company and shall remit via wire to Company the Net Sale Proceeds in accordance with the Distribution Agreement. The Distributor shall deduct the Distributor's Commission and other Distributor Deductions from the Gross Sale Proceeds.

(f) The Producer acknowledges and agrees that Company is a bona fide purchaser acting in good faith with respect to all of its interactions with the Producer, including, without limitation, all transactions contemplated by this Agreement; the Producer further acknowledges and agrees that all amounts due and owing to Company in connection with this Agreement, including, without limitation, the Prepaid Asset Pool Purchase Price, Prepayment Sales Commission, the Application Fee and any other amounts received by Company in connection with a Distributed Asset Pool are duly earned and obtained for fair and reasonable value from the Company.

(g) With respect to each Distributed Asset Pool, upon receipt of the Net Sale Proceeds from the Distributor, Company through the Platform shall calculate and notify the Producer of the following:

(i) the Gross Sale Proceeds, the Net Sale Proceeds, and the Distributor's Commission amounts and other Distributor Deductions, for such Distributed Asset Pool; and

(ii) the Prepayment Recovery Deduction to be retained by the Company and the application of the Prepayment Recovery Deduction to the amounts owed hereunder. As set forth below, the Prepayment Recovery Deduction is calculated based on the Gross Sale Proceeds and not the Net Sale Proceeds.

The remaining Net Sale Proceeds (after the deduction of the Prepayment Recovery Deduction) are paid to the Producer.

## ARTICLE 2

## DEFINITIONS

As used herein, the following terms shall have the respective meanings indicated below:

**"Advance"** means an advance of all or a portion fo the Prepaid Asset Pool Purchase Price as set forth in the Transaction Terms and shall consist of a First Advance and, to the extent set forth in the Transaction Terms, a Second Advance and subsequent advances.

**"Aggregate Estimated Gross Sale Proceeds"** means the Estimated Gross Sale Proceeds for the Prepaid Asset Pool based on the number of cases forecast to be shipped as set forth in the Transaction Terms.

**"Company Expenses"** means, with respect to each Distributed Asset Pool, all liabilities and expenses of every kind and character incurred by Company in the enforcement of its rights under this Agreement or the collection of any payments owed by Producer or Distributor, including, without limitation, all liabilities, interest, costs and fees, arising under or from any credit agreement, forward purchase agreement, note, bill of sale, open account, overdraft, credit card, lease, endorsement, surety agreement, guaranty, acceptance, foreign exchange contract or depository service contract, whether payable to Company or to a third party and subsequently acquired by Company, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing.

**"Company Proceeds"** means, with respect to a particular Distributed Asset Pool, the sum of the Prepaid Asset Pool Purchase Price, the Prepayment Sales Commission, the Application Fee (to the extent not already paid), and the Company Expenses.

**"Distributed Asset Pool"** means the portion or amount of the Prepaid Asset Pool actually sold and distributed, on a consignment basis, by the Distributor.

**"Distribution Agreement"** means a distribution agreement entered into from time to time by and between Company and a Distributor.

**"Distributor"** means a third party that sells and distributes a Distributed Asset Pool on a consignment basis.

**"Distributor's Commission"** means the commission payable to a Distributor under a Producer Distributor Agreement with respect to the sale and distribution of a Distributed Asset Pool.

**"Distributor Deductions"** means any and all (a) deductions from proceeds of the sale and distribution of a Distributed Asset Pool the Distributor deems appropriate in its business judgment and in accordance with the applicable Producer Distributor Agreement or other governing agreement and (b) taxes, fees, commissions and other amounts assessed by parties other than the Distributor or Company on account of the sale and distribution of a Distributed Asset Pool to the extent that such amounts have been actually paid by (or will contemporaneously be paid by) a Distributor out of proceeds from such sale. Producer acknowledges that Company is not responsible for the determination or verification of Distributor Deductions.

**"Effective Date"** means the effective date of the Agreement as set forth in the Transaction Terms.

**"Estimated Gross Sale Proceeds"** means an esimtate of the Gross Sale Proceeds for shipments of Produce based on the underlying Produce's prevailing market price, which shall be determined by Company in its sole discretion using five-year historical index sale value, as determined by Company by reference to the United States Department of Agriculture's Market News website (https://www.marketnews.usda.gov/mnp/fv-home), or any successor or substitute of the foregoing website providing five-year historical index sale values comparable to those currently provided by such website.

**"Gross Sale Proceeds"** means the proceeds received by the Distributor for the sale of a Distributed Asset Pool, without deduction of Distributor's Commissions or Distributor Deductions.

**"Net Sale Proceeds"** means the proceeds received by Distributor for a Distributed Asset Pool less (a) the Distributor's Commission for that Distributed Asset Pool, and (b) the Distributor Deductions for that Distributed Asset Pool.

**"Platform"** means, the software platform and software as a service solution provided by Company to the Producer, Distributor and other parties with respect to a Prepaid Asset Pool, that enables (a) the purchase and sale of the Prepaid Asset Pool to be tracked via the Platform, and (b) all funds owed to the Company or the Producer to be remitted electronically via the Platform.

**"Prepaid Asset Pool"** refers to a shipment or a series of shipments that shall be purchased by the Company before such shipment or shipments are shipped to the Company or one if its agents. The Prepaid Asset Pool consists of Produce with an Estimated Gross Sale Proceeds equal to the Aggregate Estimated Gross Sale Proceeds set forth in the Transaction Terms that are immediately next to be harvested by the Producer from the Effective Date.

**"Prepaid Asset Pool Purchase Price"** means the amount paid by the Company to Producer in advance pursuant to Section 3.2, whether it be in one or multiple payments, to fund the Producer's preseason needs with respect to, among other things, planting, growing and harvesting the Produce.

**"Prepayment Recovery Deduction"** means an amount equal to the Prepayment Recovery Deduction Rate set forth in the Transaction Terms, as the same may be modified from time to time pursuant to Section 3.7, multiplied by the Gross Sale Proceeds for all Prepaid Asset Pool shipments.

**"Prepayment Sales Commission"** means a commission payable to the Company from the Gross Sale Proceeds of each Prepaid Asset Pool in an amount equal to the total Estimated Gross Sales Proceeds multiplied by the Prepayment Sales Commission Rate, subject to adjustment pursuant to Section 3.5 below.

**"Prepayment Sales Commission Rate"** means the Prepayment Sales Commission Rate set forth in the Transaction Term.

**"Produce"** means all products, items and goods, including, but not limited to, fruits, vegetables, grains, root, crops of the forest, in their natural or unprocessed states and in all of their respective varieties, produced by a farmer and purchased by Company.

**"Producer Distributor Agreement"** means an agreement entered into from time to time by and between Producer and a Distributor related to the sale and distribution of all or a portion of the Prepaid Asset Pool.

**"Term"** means the period commencing on the Effective Date and ending on the date that the Company has been paid in full all amounts owed hereunder.

## ARTICLE 3

## BUSINESSS TERMS

Section 3.1. Basic Business Terms and License. Company shall operate the Platform as set forth in Article 1, and the Producer shall use the Platform as set forth in Article 1. Company grants the Producer the non-exclusive right and license to use the Platform during the Term on the terms set forth in this Agreement.

Section 3.2. Advance of Prepaid Asset Pool Purchase Price. To fund the Producer's preseason needs with respect to, among other things, planting, growing and harvesting the Produce, the Company agrees, subject to Section 3.10, to advance Producer up to the Prepaid Asset Pool Purchase Price in accordance with the schedule of Advances set forth in the Transaction Terms, net of the Application Fee on the First Advance.

Section 3.3. Recovery of Prepaid Asset Pool Purchase Price. In connection with the sale of the Prepaid Asset Pool, the Company is entitled to be repaid the amount of the Prepaid Asset Pool Purchase Price (which shall equal the sum of the Advances) and the Prepayment Sales Commission thereon. In order to allow the Company to be repaid the Prepaid Asset Pool Purchase Price and to receive the Prepayment Sales Commission it earns thereon, the Company shall deduct and retain from all Net Sale Proceeds a Prepayment Recovery Deduction until such time as the Company has received total Prepayment Recovery Deductions equal to the sum of the total Prepaid Asset Pool Purchase Price, plus the total Prepayment Sales Commission earned thereon, plus the Applicaton Fee, plus the Company Expenses. The Prepayment Recovery Deductions shall be applied by the Company in the following order of priority: (a) first, to pay the

Application Fee, (b) then, to repay the First Advance, (c) then, to pay the Prepayment Sales Commission on the First Advance, (d) next, to repay the Second Advance, if any, (e) then, to pay the Prepayment Sales Commission on the Second Advance if a Second Advance was made, (f) if the Company made a third or subsequent Advance, then in the order in which the Advances were made to repay the Advance and then the related Prepayment Sales Commission until all such Advances and the Prepayment Sales Commision thereon are paid in full, and (g) then, to pay Company Expenses. If the Net Sale Proceeds for any shipment or series of shipments received by the Company from the Distributor for any Prepaid Asset Pool shipment is less than the Prepayment Recovery Deduction due hereunder with respect to such Prepaid Asset Pool shipment, than the difference shall immediately become due and, until that difference has been repaid to the Company, the Company shall be entitled to the entirety of Net Sale Proceeds on a first priority basis of all other Distributed Assets Pools. Notwithstanding any other provisions in this Agreement, the Prepaid Asset Pool Purchase Price advanced by the Company to Producer pursuant to Section 3.2 is a liability of Producer that Producer will repay to the Company on the Repayment Deadline set forth in the Transaction Terms to the extent that the Prepaid Asset Pool Purchase Price has not been recovered by the Company according to this Section 3.3 prior to that date.

Section 3.4. Minimum Produce Volume. The Producer shall sell to the Company hereunder Produce with an Estimated Gross Sale Proceeds equal to or greater than the Aggregate Estimated Gross Sale Proceeds. The Producer acknowledges that the Company has entered into this agreement with the explicit purpose of earning no less than the Prepayment Sales Commission set forth in the Transaction Terms. As such, the Prepayment Sales Commissions are calculated on the basis of the Producer selling Produce to the Company in the amount of the Aggregate Estimated Gross Sale Proceeds prior to the termination or expiration of this Agreement even if the Producer does not sell that amount. The Producer covenants and agrees that it shall not sell Produce to any third party until it has sold Produce to the Company that has Estimated Gross Sale Proceeds equal to the Aggregate Estimated Gross Sale Proceeds.

Section 3.5. Prepayment Sales Commission Adjustment The unadjusted Prepayment Sales Commission is based on the assumption that each Advance, together with the Prepayment Sales Commission thereon, will be repaid in full by the "Anticipated Repayment Date" set forth in the Transaction Terms. Accordingly, if the date of repayment of the Advance and associated Prepayment Sales Commission for a particular Advance occurs after the Anticipated Repayment Date, the Prepayment Sales Commission will increase by the Daily Adjustment Factor for that Advance set forth in the Transaction Terms for each day beyond the Anticipated Repayment Date.

Section 3.6. Performance Milestones. Producer will sell to the Company Produce with Gross Sale Proceeds in the amounts set forth in the Transaction Terms under "Performance Milestones" by the Deadlines set forth therein. To the extent that Producer does not meet a Performance Milestone by the respective Milestone Deadline, then within 10 days following such Milestone Deadline, Producer shall pay to the Company an amount equal to the additional amount of Prepayment Sales Commission and Prepayment Recovery Deduction that the Company would have received to date had Producer achieved the Performance Milestone. In the event that the Producer fails to meet any Performance Milestones by the respective Milestone Deadline, the Company may in its sole discretion discontinue making any further Advances under this Agreement. Even if the Company discontinues making Advances in accordance with the previous sentence, the Producer shall be liable to pay the Company the full Prepayment Sales Commission called for under this Agreement. Amounts paid under this Section 3.6 shall be credited towards future obligations of Producer to the extent necessary so that Producer does not pay a Prepayment Sales Commission or Prepayment Recovery Deduction in excess of the maximum amounts payable therefor under this Agreement. Any Produce returned by the Company or Distributor to the Producer shall be excluded in measuring whether Producer has met the Performance Milestones, notwithstanding any provision in this Agreement or any other agreement to the contrary.

Section 3.7. Adjustment to Prepayment Recovery Deduction Rate. If the Producer fails to meet either (a) any Performances Milestone by the Milestone Deadline set forth in the Transaction Terms, or (b) 50% of its shipping forecast as set forth in the Producer Forecast attached as Exhibit B to the Agreement in the first four weeks after the first scheduled shipment on the Producer Forecast, then the Company may upon written notice to the Producer increase the Prepayment Recovery Deduction Rate to the rate the Company believes is necessary, in its sole discretion, to ensure payment of all amounts owed hereunder.

Section 3.8. Title. Producer hereby conveys to the Company all right, title and interest to the Produce included in the Prepaid Asset Pool effective upon harvest of such Produce. The Producer agrees that upon harvest, title shall automatically be conveyed without any further action on the part of Producer or the Company, and the Company shall then have all rights and title to such Produce, including, without limitation, all rights to receive the Gross Sale Proceeds and the Net Sale Proceeds of the Prepaid Asset Pool and all rights to recover the Prepayment Recovery Deduction therefrom. Upon the request of Company, the Producer shall execute all instruments and documents and take all actions as may be reasonably required to effectuate such conveyance and assignment.

Section 3.9. Application Fee. An Application Fee in the amount specified in the Transaction Terms will be due by Producer to Company. The Application Fee will be withheld from the First Advance made by the Company hereunder.

Section 3.10. Conditions to Advances. The obligation of the Company to make each Advance hereunder is conditioned upon (a) the successful completion of due diligence by the Company, (b) the Producer continuing to maintain appropriate working conditions and to remain in compliance with the Company's credit requirements, as determined by the Company in its sole discretion, (c) the Producer complying with all provisions of this Agreement, (d) the Producer shipping Produce in accordance with the forecast set forth in Exhibit B, and (e) all information provided by the Producer to the Company in connection with this Agreement being true and correct.

Section 3.11. Term and Termination. Unless terminated pursuant to this Section 3.11, this Agreement shall remain in effect during the Term. Company retains the right to terminate this Agreement and its obligations hereunder to the Producer at any time upon written notice to the Producer. The Producer may terminate its use of the Platform and this Agreement on a going forward basis, but shall not be able to terminate any transactions for the Prepaid Asset Pool identified herein, provided, further, that immediately upon such date of termination, the Producer shall no longer be entitled to access the Platform (and the non-exclusive license granted to the Producer to use the Platform in Section 3.1 shall be immediately revoked) for any Produce other than the Prepaid Asset Pool. Articles IV, V and VI will survive termination of this Agreement, together will all payment obligations to the Company hereunder with respect to the Prepaid Asset Pool, or portion thereof, purchased by the Company or that otherwise accrue hereunder.

## ARTICLE 4

## SECURITY INTEREST

Section 4.1. Intention of the Parties; Grant of Security Interest. The parties hereto expressly intend that the conveyance of Producer's right, title and interest in, to and under the Produce included in the Prepaid Asset Pool shall constitute an absolute sale, assignment and transfer of ownership of all of Seller's right, title and interest in and to the Produce included in the Prepaid Asset Pool, conveying good title free and clear of any liens, claims, encumbrances or rights of others, from Producer to the Company. It is the express intention of the parties hereto that the arrangements with respect to the Produce included in the Prepaid Asset Pool shall constitute a purchase and sale of such Produce and not a loan, financing, extension of credit or security arrangement of any type from the Company to Producer, including for tax and

accounting purposes. In the event, however, that it were to be determined that the transactions evidenced hereby constitute a loan and not a purchase and sale, it is the intention of the parties hereto that this Agreement shall constitute a security agreement under applicable law, and that Producer shall be deemed to have granted, and Producer does hereby grant, to the Company a first priority perfected security interest in all of Producer's right, title and interest, whether now owned or hereafter acquired, in, to and under Collateral (as defined below) to secure payment of the Obligations (as defined below). Each party hereto agrees not to take any action with respect to the Produce included within the Prepaid Asset Pool inconsistent with the foregoing intention.

As used herein, the following shall mean:

**"Collateral"** means, as it relates to any Prepaid Asset Pool, all of the Producer's rights, title and interest in such Prepaid Asset Pool, whether now existing or hereafter acquired, created or arising or existing, together with all other assets, personal property and rights of the Producer in such Prepaid Asset Pool, whether tangible or intangible, all proceeds and products of each of the foregoing, including any product or mass that results when any assets of the Producer in such Prepaid Asset Pool become commingled goods, and all accessions to, substitutions and replacements for, and rents, profits, increases and products of, each of the foregoing, wherever located, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Producer in respect of such Prepaid Asset Pool from time to time with respect to any of the foregoing, including, without limitation, any and all of the following assets of the Producer in such Prepaid Asset Pool: (i) accounts; (ii) bills of lading and other shipping evidence; (iii) books and records relating to the Producer's assets in such Prepaid Asset Pool; (iv) commercial tort claims; (v) documents, instruments, contracts, contract rights, chattel paper, certificates of title, warehouse receipts; (vi) goods, and inventory; (vii) farm products, including, without limitation, goods and other assets of the Producer used to engage in a farming operation (including raising, cultivating, propagating or any other farming operations) and which are: (A) crops produced on trees, vines, and bushes, including grain and other crop inventories, crops grown, growing, or to be grown, crops harvested or to be harvested in each crop year, processed crops, crop inventory, feed, seed, fertilizer, crop inputs and other supplies used or produced in a farming operation, agricultural chemicals, crop sale or marketing contracts, and related warehouse receipts, bills of lading, contract rights, crop insurance payments and indemnities, crops produced on trees, vines, and bushes; and (B) products of crops in their unmanufactured states; (viii) insurance policies, including rights under any and all (A) crop insurance payments, claims, policies and indemnities, and (c) other insurance payments, claims, policies and indemnities relating to the Producer's assets in such Prepaid Asset Pools, together with all other assets of the Producer arising from the sale, rent, lease, casualty loss or other disposition of the Producer's assets in such Prepaid Asset Pool, and any assets related to such Prepaid Asset Pool returned to, repossessed by or stopped in transit by the Producer; (ix) intellectual property; (x) general intangibles; (xi) letters of credit and letter-of-credit rights; (xii) money, deposit accounts, commodity accounts, securities accounts, financial assets, and investment property; (xiii) retainages, per unit retains other retainage arrangements capital credit accounts; capital accounts or reserves, rebates; patronage dividends; cash and crop share rents; land rents; leases; rights to leases; and all other rights to payment pertaining to thereto; (xiv) supporting obligations; (xv) tax refunds and rights related thereto paid at any time to any governmental entity; and (xvi) subsidies, including rights to any and all government program payments and all government subsidies, whether now owned or hereafter acquired, including, but not limited to, all deficiency, disaster, conservation and storage payments, Conservation Reserve Program, Direct and Counter-Cyclical Payment Program, Conservation Reserve Enhancement Program, Market Loss Assistance Payment Program and Loan Deficiency Payment Program payments, oil seed payments and any and all other governmental subsidiaries or entitlements of every type and nature. The foregoing asset classes describing the Producer's assets, whether capitalized or not, shall have the meanings ascribed to them in the Uniform Commercial Code as in effect from time to time in the State of California.

**"Obligations"** means all obligations, indebtedness and liabilities of the Producer whether individual, joint and several, absolute or contingent, direct or indirect, liquidated or unliquidated, now or hereafter existing in favor of the Company under this Agreement or any other agreement or instrument, including without limitation, all liabilities, all interest, costs and fees arising under or from any note, open account, overdraft, letter of credit application, endorsement, surety agreement, guaranty, credit card, lease, rate management transaction, acceptance, foreign exchange contract or depository service contract, whether payable to the Company or to a third party and subsequently acquired by the Company, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing. The Producer and the Company specifically contemplate that Obligations include indebtedness hereafter incurred by the Producer to the Company.

Section 4.2. Financing Statement. The Producer authorizes the Company to file one or more financing statements or similar records covering the Collateral or such lesser amount of assets as the Company may determine, or the Company may, at its option, file financing statements or similar records containing any collateral description which reasonably describes the Collateral, and the Producer will pay the cost of filing them in all public offices where filing is deemed by the Company to be necessary or desirable. Any such financing statements may indicate the Collateral as "all assets of the Producer related to the following Prepaid Asset Pools PP######" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in the Company's sole discretion.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

Section 5.1. By Producer. The Producer hereby represents and warrants to Company as follows:

(a) it is duly organized, validly existing and in good standing under the laws of its state of organization and has the power and authority to enter into this Agreement and to fully perform its obligations hereunder;

(b) this Agreement has been executed by its duly authorized representative and constitutes its valid, binding obligation;

(c) it owns sufficient rights in the Produce to be able to transfer title to the Prepaid Asset Pool to be conveyed to Company hereunder;

(d) the Produce will be of merchantable quality, fit for its particular purpose;

(e) the Prepaid Asset Pool to be conveyed to Company hereunder is the exclusive property of the Producer and is not subject to any lien, consignment arrangement (other than as contemplated in the applicable Distribution Agreement), encumbrance, security interest, charge, filing with a personal property registry or any financing statement whatsoever;

(f) it has not, and will not during the term of this Agreement, use as collateral with any creditors, or otherwise grant a security interest in or lien on, its accounts, accounts receivable or any proceeds from the sale of the Produce;

(g) the Produce that comprises the Prepaid Asset Pool to be conveyed to Company hereunder complies with all applicable laws, statutes, regulations and judgments, including, if applicable, all requirements of the United States Food and Drug Administration and the United States Department of Agriculture;

(h) it has all licenses, permits, consents or approvals from or by, and has made all filings with, and has given all notices to, all governmental authorities having jurisdiction, to the extent required for it to produce the Produce and sell it to Company hereunder; and

(i) Accuracy of data in Platform – Producer is responsible for ensuring that all information regarding the Producer and the Produce in the Platform is true, accurate and complete. Information that is the responsibility of the Producer includes but is not limited to: commodity type, unit of measure, items per unit, units. Any errors or costs resulting from inaccurate information that is validated as accurate by the Producer will be at the cost to the Producer.

Section 5.2. By Company. Company hereby represents and warrants to the Producer as follows:

(a) it is duly organized, validly existing and in good standing under the laws of its state of its incorporation and has the power and authority to enter into this Agreement and to fully perform its obligations hereunder; and

(b) this Agreement has been executed by its duly authorized representative and constitutes its valid, binding obligation.

## ARTICLE 6

## MISCELLANEOUS

Section 6.1. Indemnification.

(a) By Company. Company shall defend, indemnify and hold harmless the Producer and its officers, directors, employees, agents, subsidiaries and other affiliates, from and against any and all potential or actual third party claims, damages, costs, liability, and expense whatsoever (including reasonable attorneys' fees) relating to (i) the failure of any representation or warranty of Company made hereunder to be true and correct when made, and (ii) claims that the Platform infringes upon the intellectual property rights of any third party.

(b) By Producer. The Producer shall defend, indemnify and hold harmless Company and Company's officers, directors, employees, agents, subsidiaries and other affiliates from and against any and all potential claims or actual third party claims, damages, costs, liability, and expense whatsoever (including reasonable attorneys' fees) arising from: (i) any claims relating to the failure of any representation or warranty of the Producer made hereunder to be true and correct when made; (ii) any action or omission by the Producer which results in the imposition of any lien, consignment to a third party, encumbrance, security interest or charge with respect to the Prepaid Asset Pool; (iii) any taxes assessed with respect to the sale and distribution of each Distributed Asset Pool, to the extent not paid by a Distributor; and (iv) any damage or injury caused by the Produce, including any product liability claims or recall costs.

Section 6.2. Confidentiality. The Producer shall strictly maintain and shall cause its officers, directors, employees, and agents to so maintain, the confidentiality of the terms of this Agreement and any

trade secrets, know-how, Distributor lists, financial information or other proprietary information of Company or its affiliates which is not a matter of public knowledge, which, for the avoidance of doubt, shall include information regarding the operation of the Platform and any documentation thereof (collectively, the **"Proprietary Information"**) during the Term of this Agreement and for two (2) years thereafter (such period, the **"Restricted Period"**). For purposes hereof, Proprietary Information shall not include information disclosed by Company or its Affiliates to the Producer which the Producer can establish (a) was known by the Producer or any of its divisions, subsidiaries or affiliates prior to the date thereof; (b) was received by the Producer from a third party having the lawful right to disclose such information; or (c) is in the public domain through no fault of the Producer or its officers, directors, employees, affiliates or agents. The Producer shall not make or retain any copies of any Proprietary Information that may have been entrusted to it. Upon termination of this Agreement for any reason, the Producer shall immediately cease using any Proprietary Information. Given the nature of the Proprietary Information and the competitive damage that would result to Company upon unauthorized disclosure, use or transfer of its Proprietary Information to any third party, the parties agree that monetary damages may not be a sufficient remedy for any breach of this Section 6.2. In addition to all other remedies, Company shall be entitled to seek specific performance and injunctive and other equitable relief as a remedy for any breach or threatened breach of this Section 6.2.

Section 6.3. Non-competition, Non-solicitation and Non-disparagement. The Producer shall not, at any time:

(a) during the Restricted Period, directly or indirectly, own, operate, manage, control, participate in, be employed by, consult with, advise or engage in services for any person or entity engaged in Company's business of providing an online software platform to facilitate alternative financing options for producers of Produce;

(b) during the Restricted Period, directly or indirectly induce or attempt to induce any Distributor, customer, client, vendor, supplier or other business relation of or to Company or any of its affiliates, to cease doing business on the Platform or with Company or any of its affiliates, to reduce or otherwise adversely change its business on the Platform or with Company or any of its affiliates, or in any other way deliberately interfere with the relationship between Company or any of its affiliates, on the one hand, and any such Distributor, customer, client, vendor, supplier or other business relation, on the other hand; or

(c) after the Effective Date, directly or indirectly, make any written or oral statement concerning Company that is harmful to Company, its business or the business reputation of Company.

Section 6.4. DISCLAIMER; LIMITATION OF LIABILITY. UNDER NO CIRCUMSTANCES SHALL COMPANY BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, OR SPECIAL DAMAGES OR COSTS OF ANY NATURE SUFFERED BY THE PRODUCER RELATING TO THIS AGREEMENT, REGARDLESS OF WHETHER COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR COSTS. COMPANY DISCLAIMS ALL WARRANTIES RELATING TO THE PLATFORM, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. COMPANY PROVIDES THE PLATFORM AND ASSOCIATED SERVICES "AS IS" WITHOUT ANY OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY. COMPANY DOES NOT WARRANT THAT THE PLATFORM WILL BE ERROR-FREE OR THAT ACCESS TO THE PLATFORM WILL BE UNINTERRUPTED. COMPANY SHALL NOT BE LIABLE TO THE PRODUCER FOR ANY LOSS DUE TO PROBLEMS OR ISSUES ARISING WITH THE PLATFORM, ANY DISTRIBUTOR OR ITS WAREHOUSING OR HANDLING OF THE PRODUCE OR ANY DISTRIBUTED ASSET POOL FOR COMPANY OR THE PRODUCER AS CONSIGNOR.

COMPANY'S MAXIMUM LIABILITY HEREUNDER SHALL BE LIMITED TO THE PREPAYMENT SALES COMMISSION ACTUALLY RECEIVED.

Section 6.5. Further Assurances. Each party to this Agreement shall execute all instruments and documents and take all actions as may be reasonably required to effectuate this Agreement and the terms hereunder.

Section 6.6. Reservation of Rights. Company retains all rights not granted or allowed hereunder, including all rights of ownership to the Platform and all rights to use all data and statistics generated by the Platform, including with respect to the Prepaid Asset Pool.

Section 6.7. Independent Contractor Status. In the performance of the obligations contained in this Agreement, the parties shall be independent contractors.

Section 6.8. Notices (Physical and Electronic). All notices or other communication required or permitted to be given pursuant to this Agreement shall be addressed to Producer at the address or to the Company at its principal offices. All notices under this Agreement shall be deemed to have been duly given or made if sent by one of the following means: (i) electronically through the Platform or through an email address provided in this Agreement; (ii) registered or certified U.S. or national mail service mail, return receipt requested; (iii) hand delivered; or (iv) sent by prepaid overnight courier such as Federal Express. Each notice or other communication shall be deemed to have been given or made on the date of actual receipt by the recipient. Either party may give to the other written notice of change of address, in which event any communication shall thereafter be given to such party as above provided at such changed address.

Section 6.9. Survival of Representations and Warranties. All representations, warranties and agreements contained in this Agreement shall remain operative and in full force and effect and shall survive conveyance of the Prepaid Asset Pool by the Producer to Company and the conveyance by Company to any other party.

Section 6.10. Insurance. With respect to the Prepaid Asset Pool, the Company may purchase insurance in such amount and of such type that it deems necessary to protect its interest in the Prepaid Asset Pool. For the avoidance of doubt, the foregoing insurance policy shall be in the name of the Company and the Producer shall execute all such documentation deemed necessary or advisable by the Company, in its sole discretion to purchase and maintain such insurance policy and the Producer will pay all costs associated with purchasing and maintaining such insurance policy.

Section 6.11. Disclosure of Other Distributors. The Producer shall disclose the name of any and all distributors, marketers and other persons that it is considering engaging to distribute the Produce. Such Distributor will need to be approved by the Company before the Producer can ship them Produce.

Section 6.12. Governing Law. This Agreement and all performance under this Agreement shall be governed by the laws of the State of Delaware without regard to conflict of law principles that would require the application of the laws of another jurisdiction. In any dispute relating to this Agreement, the parties hereto admit venue and submit themselves to the exclusive jurisdiction of the state or federal courts located in the State of Delaware.

Section 6.13. Severability; Reformation. In the event any provision of this Agreement is determined to be invalid, prohibited or unenforceable by a court or other body of competent jurisdiction, this Agreement shall be construed as if such invalid, prohibited or unenforceable provision has been more narrowly drawn so as not to be invalid, prohibited or unenforceable.

Section 6.14. Assignment. The Producer may not assign this Agreement without the advance written consent of Company, which may be withheld in Company's sole discretion. Company may assign or sublicense all or any part of its rights and obligations under this Agreement in its sole discretion.

Section 6.15. Waiver; Modification. No waiver or modification of this Agreement or of any covenant, condition or limitation contained herein shall be valid or effective unless it is (a) in writing and duly executed by the parties hereto, or (b) electronically accepted by Producer on the Platform. Producer's continued use of the Platform after notification of modifications of this Agreement by Company via the Platform will be deemed electronic acceptance by Producer hereunder.

Section 6.16. Entire Agreement. This Agreement, together with any other agreements referenced therein, shall constitute the entire agreement between the parties, and supersedes and replaces all prior agreements and understandings, whether written or otherwise, relating to its subject matter.

Section 6.17. Counterparts. This Agreement may be executed by PDF or facsimile, email, electronic signature (such as SignNow, DocuSign or EchoSign), or through electronic acceptance through the Platform, and in one or more counterparts, each of which shall constitute a duplicate original of this Agreement but together shall constitute one and the same instrument.

Section 6.18. Attorneys' Fees. in any action arising out of or relating to this Agreement, the non-prevailing party will pay the substantially prevailing party's reasonable attorneys' fees, costs, and necessary disbursements, whether or not the action is prosecuted to award or judgment.

Section 6.19. Privacy Policy. Producer hereby consents to the Company's privacy policy, located at https://producepay.com/privacy/, which describes Company's privacy practices and is incorporated by reference into this Agreement. By Producer's continuing use of the Platform, Producer consents to any updates to the Company's privacy policy that may be published on the Company's website or the Platform from time to time.

*End of General Terms and Conditions*

**Exhibit B**

[illegible]

**Producer Forecast**

*[See attached]*